[Cite as *State v. Cansler*, 2025-Ohio-2558.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO, | : | | |
| Appellee, | : | CASE NO. CA2024-10-077 | |
| - vs - | : | <u>OPINION AND</u><br><u>JUDGMENT ENTRY</u><br>7/21/2025 | |
| | : | | |
| BRIAN SCOTT CANSLER, | : | | |
| Appellant. | : | | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2023-CR-00582

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas A. Horton, Assistant Prosecuting Attorney, for appellee.

Angela J. Glaser, for appellant.

# **O P I N I O N**

**SIEBERT, J.**

{¶ 1} Brian Scott Cansler appeals his conviction in the Clermont County Court of Common Pleas for murder. On appeal, Cansler argues his conviction was against the

manifest weight of the evidence, and he received ineffective assistance at trial. We overrule both assignments of error. While the State presented minimal direct, physical evidence, it still presented overwhelming circumstantial evidence. As a result, Cansler's conviction was not against the manifest weight of the evidence. In addition, the decision by Cansler's counsel to not challenge the admissibility of a possible murder weapon was a reasonable trial strategy and not evidence of ineffective assistance of counsel. We affirm Cansler's conviction.

## I.    Factual and Procedural Background

{¶ 2}   Cansler entirely refused to participate in his defense. He did not speak to his counsel, court-appointed psychologists, or the court during the proceedings below. The trial court found Cansler competent to stand trial and voluntarily refused to cooperate in his own defense. David Larkin, at whose home the underlying events took place, died before trial. Tyler Roper, also present at the time of the murder, could not be located before trial. Kristina Northgard was the only individual present at the time of the murder who testified at trial. This court bases the following summary of events off the available record, including testimony of Northgard and law enforcement's investigation.

**The Shooting**

{¶ 3}   In September of 2023, John Smith,[1] Northgard, and Roper were at Larkin's trailer home. Northgard lived with Larkin at the time, though they were not in a romantic relationship. Everyone present smoked methamphetamine throughout the day. That evening, Cansler, Larkin's nephew, came to the trailer home. Although Larkin initially asked Cansler to leave, he eventually permitted Cansler to stay and take a shower. After

---

1. John Smith is a pseudonym adopted for this opinion to protect the privacy of the victim and his family. *See In re D.P.* 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn. 1, *Supreme Court of Ohio Writing Manual* 115 (3rd Ed. 2024).

his shower, however, Cansler stuck around and smoked methamphetamine with everyone else present.

{¶ 4} Northgard described Smith and Cansler as her "best friends." Northgard and Cansler, however, were also "friends with benefits." According to Northgard, Cansler sometimes grew paranoid when under the influence of methamphetamine, and Cansler repeatedly asked Smith that night why Smith was at Larkin's trailer.

{¶ 5} Early the next morning (around 2 a.m.), everyone in the trailer was still awake and continued to smoke methamphetamine. Smith was in Larkin's living room working on a project. Around this time, Cansler went back and forth between Northgard's room and the living room. About 30 seconds after Cansler went to the living room for the final time, Larkin, Northgard, and Roper all heard a loud "pop." Northgard believed the sound was a gunshot. Northgard testified she did not hear an argument or struggle before the gunshot. Police later found no sign of forced entry or struggle in Larkin's trailer.

{¶ 6} After leaving her room to investigate, Northgard saw Cansler heading out of the back door of the trailer. Cansler looked back at her and then left the home with a white canvas tote Northgard had washed for Larkin earlier that day. Northgard "could tell there was a little something with weight" in the middle of the bag. Larkin and Roper went into the living room and found Smith lying dead on the floor from a gunshot wound.

{¶ 7} Northgard and Roper subsequently left Larkin's trailer because they had warrants out for their arrest, but Northgard told Larkin to call 911. Larkin did so and provided the 911 dispatcher with a description of Cansler. A few days after the shooting, Northgard and Roper turned themselves into the police and gave statements which corroborated Larkin's version of the events.

**Cansler's Capture and Arrest**

{¶ 8} Sergeant Dowers, of the Clermont County Sheriff's Office, responded to the

trailer park and encountered Cansler coming out of a ditch. Sergeant Dowers' body camera footage showed it was 2:48 AM. Cansler had a hoodie pulled tight around his face and refused to remove his hands from his pockets, despite repeated orders to do so from Sergeant Dowers. Officers arrested Cansler and then determined he was the suspect in Smith's shooting. Cansler was unarmed when detained and did not have the bag Northgard observed in Cansler's possession when he left Larkin's home.

**Cansler's Clothes and the Missing Bag**

{¶ 9}   Police later released a media request for help locating the white tote bag as well as the firearm used to kill Smith. Kayla Wachter subsequently contacted police. She testified at trial that on the night of the shooting Cansler knocked on the door to her trailer between 1:30 and 2:30 AM, holding a cloth bag. He asked Wachter if he could borrow some clothes. After changing into the clothes she gave him, Cansler asked Wachter to keep the clothing he had removed and stored in the "white cloth bag" Wachter observed him holding when he arrived. The police retrieved the clothing Cansler wore that night, and his jacket tested positive for gunshot residue.

**The Gun**

{¶ 10}  The coroner identified a single gunshot wound to the head as Smith's cause of death, and the bullet was removed during the autopsy. Ohio's Criminal Bureau of Investigation ("BCI") determined that the bullet was a .32 Smith & Wesson long. Police found no bullet casing at Larkin's trailer, leading them to believe that the murder weapon was a revolver or that the casing had been picked up. Northgard testified she never knew Cansler to own a gun, but a few days before Smith was shot, Cansler showed her a black revolver and asked if she thought it was real. Cansler then went outside, and Northgard heard the gun misfire before a round was fired.

{¶ 11} Believing they were looking for a .32 caliber revolver, police later retrieved

a black revolver from Jordan Elliot. Elliot lived near the boyfriend of Cansler's mother. Police learned that Elliot was attempting to sell the revolver around the time of Smith's death and stored it in a barn. The revolver was a Smith & Wesson model 30-1. That model was designed to fire .32 Smith & Wesson long bullet cartridges; the same type of bullet recovered from Smith's body.

{¶ 12} Forensic testing on the bullet recovered from Smith's body showed that the internal rifling on the gun barrel it was fired from had "five lands and grooves with a right-hand twist." Elliot's revolver had the same lands and grooves. A BCI technician noted that rifling pattern is "unique to a smaller group of firearms," that it was "uncommon" for people to own .32 Smith & Wesson long firearms, and that he had only seen a small number of them in his career. While BCI could not conclude Elliot's revolver was used to kill Smith, BCI also could not exclude it.

{¶ 13} Cansler's trial counsel did not object to the revolver being admitted into evidence. However, Cansler's counsel pressed the BCI technician on the fact that the recovered revolver could not be definitively determined to be the murder weapon and that other guns had the same rifling pattern as that revolver. Cansler's counsel also stressed to the jury during closing arguments that the State never definitively produced a murder weapon tied to Cansler.

{¶ 14} The jury found Cansler innocent of aggravated murder, but guilty of murder and two counts of tampering with evidence. Cansler was sentenced to 24 years to life in prison. Cansler now appeals, arguing that his murder conviction was against the manifest weight of the evidence and that his trial counsel was ineffective. Cansler makes no arguments on appeal regarding his tampering with evidence convictions.

## II.        Law and Analysis

### A.        First Assignment of Error: Manifest Weight and Sufficiency

{¶ 15} Cansler argues his conviction was against the manifest weight of the evidence and based on legally insufficient evidence because the State relied on testimony from unreliable witnesses who did not observe the shooting, and the State did not prove what Cansler's motive may have been to shoot Smith. We disagree.

### 1.  The Murder and Culpable Mental State Statutes

{¶ 16} Murder is defined as "purposely caus[ing] the death of another . . ." R.C. 2903.02(A). "Purpose" to commit a crime is found if "it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 17} The "purpose" to cause the death of another may be inferred from using a deadly weapon, even though such use is not conclusive evidence of purpose. *State v. Doby*, 2014-Ohio-2471, ¶ 39 (12th Dist.). Firing a gun at an individual's head can be evidence that the killing was not a result of pure impulse. *State v. Braden*, 2003-Ohio-1325, ¶ 65. Stated differently:

> [A]n intent to kill may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.

*State v. Tolliver*, 2004-Ohio-1603, (10th Dist.), quoting *State v. Robinson* 161 Ohio St. 213 (1954), paragraph 5 of syllabus.

### 2.  Standard of Review for Manifest Weight and Sufficiency

{¶ 18} "A manifest weight of the evidence challenge examines the 'inclination of

the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other.'" *State v. Madden*, 2024-Ohio-2851, ¶ 32, quoting *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

{¶ 19} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 14 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.).

{¶ 20} "When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Madden* at ¶ 31, citing *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 21} "Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of

- 7 -

the issue of sufficiency.'" *State v. Billingsley*, 2020-Ohio-2673, ¶ 15 (12th Dist.), quoting *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.).

### 3. Manifest Weight of Evidence Supported Cansler's Conviction

{¶ 22} Cansler first argues his murder conviction was against the manifest weight of the evidence because the State's case largely depended on the statements and testimony of admitted drug users who did not observe the shooting. Cansler is correct that most evidence in this case, including much of Northgard's testimony, was circumstantial evidence, but he ignores the legal truism that circumstantial and direct evidence have the same probative value. *State v. Lee*, 2021-Ohio-2544, ¶ 25 (12th Dist.). In some instances, certain facts can be established only by circumstantial evidence. *Id*. Physical evidence, like DNA or fingerprints, is not required to sustain a conviction, and "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Cook*, 2023-Ohio-256, ¶ 31 (12th Dist.), quoting *State v. Poindexter*, 2021-Ohio-1499, ¶ 22 (10th Dist.).

{¶ 23} The State presented overwhelming circumstantial evidence in this case. The only people in the trailer at the time of the shooting were Smith, Larkin, Northgard, Roper, and Cansler. The evidence showed no signs of forced entry into Larkin's home or of a struggle before Smith's death, meaning it would be entirely reasonable for the jury to conclude Smith's killer was one of the other people in the home. Of these individuals, Northgard was the only one able and willing to testify, but Larkin and Roper's police statements corroborated her testimony as to the immediate events surrounding Smith's death. Ultimately, it was up to the jury to decide if these individuals were reliable witnesses despite the fact they were under the influence of methamphetamine. *Blankenburg*, 2012-Ohio-1289, ¶ 14.

{¶ 24} Assuming the jury did find them credible, Northgard's testimony was clear—

she believed Cansler, her "friend with benefits," who sometimes grew paranoid while under the influence of drugs, shot Smith—also a close friend of Northgard's—after repeatedly asking why he was present at Larkin's home with Northgard. The clothes Cansler was wearing when he left Larkin's home and later stowed at Wachter's nearby home that night tested positive for gunshot residue. Without even considering the revolver seized by law enforcement (discussed in Cansler's second assignment of error), the evidence and testimony presented at trial weighed heavily in favor of the jury's conclusion that Cansler purposely caused Smith's death by shooting him in the head.

{¶ 25} Nonetheless, Cansler also asserts the State's case was lacking because it did not prove any motive Cansler may have had to kill Smith. Because of this, Cansler reasons that "if [he] shot [Smith], it *had* to have been an accident or he believed he was in fear but he certainly did not act with purpose" (Emphasis added).

{¶ 26} This argument flies in the face of Ohio law. "Motive is not an element of the crimes for which [Cansler] was charged and the [S]tate did not have to offer proof of motive to sustain a conviction for murder . . . ." *State v. Cook*, 2023-Ohio-256, ¶ 32 (12th Dist.). Again, regardless of motive, the jury could infer someone purposefully caused Smith's death because Smith was shot in the head. *Braden*, 2003-Ohio-1325 at ¶ 65.

{¶ 27} The jury did not lose its way—the record before this court shows the manifest weight of the overwhelming circumstantial evidence produced by the State supported Cansler's conviction. Necessarily, this means it was based on legally sufficient evidence. This assignment of error is overruled.

### B.    Second Assignment of Error: Ineffective Assistance of Counsel

{¶ 28} Cansler argues his trial counsel provided him with ineffective assistance because he did not object to the admission of Jordan Elliot's firearm into evidence. His argument lacks merit.

### 1. Standard of Review for Ineffective Assistance of Counsel

{¶ 29} Criminal defendants are entitled to effective assistance of counsel. *State v. Lloyd*, 2022-Ohio-4259, ¶ 14. The conduct of counsel is presumed to be effective, but "that presumption can be overcome." *Id*. To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Courts determine deficient performance by asking whether counsel's conduct "fell below an objective standard of reasonableness" based on "the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 688, 690. In turn, prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A defendant's failure to sufficiently show either *Strickland* prong is fatal to a claim of ineffective assistance. *Lloyd* at ¶ 31, citing *Strickland* at 697.

### 2. Cansler's Counsel Provided Effective Assistance

{¶ 30} Cansler argues his trial counsel was ineffective for not objecting to the admission of Jordan Elliot's firearm into evidence because, "[w]ithout the firearm, the [S]tate's only physical evidence was gunshot residue on Brian's clothing." This may be true. But a conviction may be supported by circumstantial evidence alone—here, the State presented overwhelming circumstantial evidence of Cansler's guilt.

{¶ 31} Cansler also asserts the firearm was not relevant because it had no proven ties to Cansler. He likens his case to *State v. Thomas*, 2017-Ohio-8011. In *Thomas*, the Ohio Supreme Court held that the defendant's collection of "full Rambo combat knives" were entirely unrelated to the charged crimes and were presented merely to show the defendant acted in "conformity with a character trait for violence." *Id*. at ¶ 48. Such "propensity evidence" is not admissible under Ohio law. *Id*.; Evid.R. 404(B).

{¶ 32} Here, the revolver was presented as a possible murder weapon, not to show Cansler had a propensity for violence. Furthermore, several pieces of evidence presented at trial suggested the revolver, unlike any of the knives at issue in *Thomas*, could very well have been the murder weapon: (1) the revolver looked similar to the gun Northgard saw in Cansler's possession days prior to Smith's murder; (2) the revolver had rifling consistent with the groove patterns found on the bullet retrieved from Smith's body; (3) the gun fired .32 caliber Smith & Wesson long cartridges, the same type of bullet recovered from Smith's body; (4) guns that could fire this ammunition were relatively "uncommon" according to the BCI technician who examined the gun; and (5) the gun was seized from the barn of an acquaintance of Cansler's family who was looking to sell the weapon.

{¶ 33} Cansler's arguments are also unconvincing because trial counsel cannot be deemed ineffective for not pursuing every possible objection, particularly if trial strategy is involved. *State v. Holloway*, 2024-Ohio-3360, ¶ 47-48 (12th Dist.), *State v. Tibbetts*, 92 Ohio St.3d 146, 171 (2001). Moreover, "the fact that [a] trial strategy was ultimately unsuccessful or that there was another possible and better strategy available does not amount to ineffective assistance of counsel." *State v. Murphy*, 2009-Ohio-6745, ¶ 43 (12th Dist.). Stated differently, "[d]ecisions about 'the viability of certain defenses' are 'within the exclusive province of defense counsel to make after consultation with his client.'" *State v. Murphy*, 2001-Ohio-112, ¶ 55, quoting *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir. 1993).

{¶ 34} Cansler does not assert on appeal that his trial counsel failed to object to admission of the gun over Cansler's wishes—an argument that would have been hard to make because Cansler voluntarily refused to communicate *anything* to his trial counsel. Furthermore, Cansler's trial counsel stressed in closing that Elliot's revolver possessed

no definitive forensic or personal ties to Cansler. Not objecting to admission of the firearm could be viewed as part of a valid (even if unsuccessful) tactic to convince the jury that the State was "reaching" to meet its burden of proof.

{¶ 35} Upon review, we conclude Cansler can satisfy neither of the two *Strickland* prongs. The State presented evidence which suggested the revolver could be the murder weapon. This made the revolver relevant, and Cansler's trial counsel had no grounds to object to its admission. The defense's closing arguments also suggest an objectively reasonable strategy of questioning the gun's tangential ties to Cansler in order to cast doubt on the State's case. Even assuming Cansler's counsel erred in pursuing such a strategy (again, he did not), such error did not prejudice Cansler because, as discussed in his first assignment of error, more than enough evidence existed outside of the revolver to convict Cansler.

{¶ 36} This assignment of error is overruled.

### III. Conclusion

{¶ 37} The manifest weight of the evidence supported Cansler's conviction for murder because even though the State's case lacked direct physical evidence, other pieces of evidence, including Northgard's testimony, supported the jury's verdict. The record demonstrates the gun was relevant, admissible, and trial counsel utilized the State's inability to tie the gun directly to Cansler as part of his valid, albeit unsuccessful, trial strategy.

Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.

## **J U D G M E N T   E N T R Y**

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Melena S. Siebert, Judge